UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LAI MING CHUI,

               Plaintiff,                       Case No. 1:11-cv-119

v.                                          Hon. Paul L. Maloney
                                               Chief, U.S. District Court Judge

PATRICK R. DONAHOE,
Postmaster General,                          Hon. Joseph G. Scoville
                                                United States Magistrate Judge

               Defendant.
_____/


**DEFENDANT'S MEMORANDUM IN SUPPORT OF**
**MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff, Lai Ming Chui, was hired by the United States Postal Service to be a flat sorter machine operator at the Kalamazoo Processing and Distribution Center ("P&DC"). Plaintiff Chui ("Chui") was later converted to a mail processing clerk. While a mail processing clerk, she incurred an on-the-job injury. Since that time, she has been unable to perform the essential functions of her position as mail processing clerk. Chui alleges that Defendant, Patrick R. Donahoe, Postmaster General of the United States Postal Service ("Postal Service") discriminated against her in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq.*, ("the Rehabilitation Act") based on her disability; and in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et. seq.*, ("Title VII"); and 42 U.S.C. § 1981a, under Section 717 of the Equal Employment Opportunities Act of 1973, as amended, based on her race and national origin. She also alleges that the Postal Service retaliated against her when she was placed on "standby" time and told not to wear a particular pair of pants at work. Chui,

however, cannot recover under any theory for disability-discrimination as she is not a qualified individual with a disability under the Rehabilitation Act. Moreover, the record does not contain any evidence that she suffered an adverse action, or that similarly situated employees were treated better than her. The remainder of Chui's claims also requires judgment in the Postal Service's favor, because Chui failed to exhaust her administrative remedies. For these reasons, among others, Defendant Patrick R. Donahoe, United States Postmaster General, is entitled to summary judgment on all of Chui's claims pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

## STATEMENT OF FACTS

### I.    Chui's Postal Service Employment History And On-The-Job Injury.

Chui, who was born in China, began working with the Postal Service on September 12, 1998 as a flat sorting machine operator at the Kalamazoo P & DC. (EX. 1, Chui Depo., at pp. 7, 9-10, 24-27; Chui Deposition Exhibit 1.)[1] Chui was later converted to a mail processing clerk in November 2001, which is considered her official position. (EX. 1, Chui Depo., at pp. 38-42; Chui Deposition Exhibit 2; EX. 2, Declaration of Linda Woods, at ¶ 5.)[2]

The functional purpose of a mail processing clerk is to "[p]erform . . . a variety of clerk duties required to process mail using automated mail processing equipment or manual methods of sortation and distribution." (EX. 1, Chui Depo., at pp. 42-46; Chui Deposition Exhibit 3.) In addition, the physical requirements of a mail processing clerk are: lifting/carrying up to 70 pounds intermittently eight hours per day; no sitting; standing eight hours per day; walking eight hours per day; intermittent climbing four hours per day; intermittent kneeling four hours per day; intermittent bending or stooping four hours per day; intermittent twisting four hours per day;

---

[1] Hereinafter, the Deposition of Lai Ming Chui will be referred to as "EX. 1, Chui Depo" and the exhibits attached to the Deposition of Lai Ming Chui will be referred to as "Chui Deposition Exhibit __."
[2] Hereinafter, the Declaration of Linda Woods will be referred to as "EX. 2, Woods Decl."

intermittent pulling or pushing four hours per day; intermittent simple grasping six hours per day; no fine manipulation; and intermittent reaching above the shoulder four hours per day. (EX. 1, Chui Depo., at pp. 47-48, 183-185; Chui Deposition Exhibit 3, at p. 2 and 19.)

Chui's duties as a flat sorter operator or mail processing clerk involved working on the flat sorter or LIPS machines; and casing flats, which are large envelopes or magazines. (EX. 1, Chui Depo., at pp. 10-14, 46-47.) Chui admitted that while working on the machines, she was required to rotate the duties of keying (i.e., typing in the zip codes and moving the mail to a window that transports the mail onto a conveyor) and loading (i.e., pushing/pulling containers of mail; bending into the containers; lifting tubs of mail weighing 20 to 50 pounds; placing and facing mail onto a ledge) every 15 minutes. (EX. 1, Chui Depo., at pp. 10-22.) While casing mail, Chui testified that she was required to stand at a case and place mail into pigeon holes, sorting by zip code or town. (EX. 1, Chui Depo., at pp. 21-23.) The physical duties of casing require reaching and twisting. (EX. 2, Woods Decl., at ¶ 14.)

While working as a mail processing clerk, on December 31, 2001, Chui suffered a work-related injury to her left shoulder and left trapezius. (EX. 1, Chui Depo., at pp. 37, 74, 92-94; Chui Deposition Exhibits 6 and 7.) After a period of absence because of her injury, she returned to work on or about June 12, 2002 and worked in a limited duty assignment; which is a temporary assignment given to employees who suffered a work-related injury. (EX. 1, Chui Depo., at pp. 75, 78-83, 98-108; Chui Deposition Exhibits 4, 10-12; EX. 2, Woods Decl., at ¶ 3.) In March 2003, a physician determined that Chui's injuries were permanent and that she reached maximum medical improvement. (EX. 1, Chui Depo., at pp. 84-87, 185-186; Chui Deposition Exhibit 4, at pp. 41-47; Chui Deposition Exhibit 20.) That physician restricted her to the following: two hours reaching, two hours twisting, able to work two hours, lifting 15 pounds

frequently and 30 pounds occasionally for no more than two hours. (*Id.*) Those restrictions remained in effect throughout the remainder of Chui's employment with the Postal Service. (*Id.*). Later that same year, Chui suffered another work-related injury to her left trapezius and lumborsacral, which did not result in a change to her medical restrictions. (EX. 1, Chui Depo., at pp. 84-87, 94-98, 185-186; Chui Deposition Exhibit 4 at pp. 41-47; Chui Deposition Exhibits 8, 9, 20.)

Based on the permanency of Chui's medical conditions, she worked in rehabilitation job offer assignments, from February 2004 thru July 2007, that consisted of the following duties: process union information requests by searching for information on the computer or in filing cabinets located in the supervisor's office, (i.e., such as the names of employees who were called for overtime, an employee's clock rings on a Time and Attendance Collection System ("TACS") report or discipline issued to employees); filing employees' requests for leave that is documented on a Request for Notification of Absences, PS Form 3971, in a filing cabinet in the supervisor's office; recording bargaining unit employees' schedules by entering the schedules that were already made by a supervisor onto the computer; preparing the holiday schedules by typing the holiday volunteer signup form and giving the typed signup sheet to the supervisor; compiling the quarterly overtime desired list by typing the form for employees to sign and placing the forms in a folder; filing and photocopying safety service talks that supervisors read to the employees; and general typing, as well as, any special projects the supervisors or managers assigned to her, such as making placards/labels or working in the registry room making bags. (EX. 1, Chui Depo., at p. 98, 110-129, 131-133; Chui Deposition Exhibits 14, 16; EX. 2, Woods Decl., at ¶¶ 3, 7.) In addition, between 2007 and 2009, Chui printed TACS reports and attended supervisor meetings so she could write delivery scores on the dry erase board. (EX. 1, Chui Depo., at pp. 144-147.) In short, when

Chui returned to work in June 2002, she was not required to perform the duties of her mail processing clerk position; instead she was provided with limited duty and rehabilitation job offer assignments within her medical restrictions. (EX. 1, Chui Depo., at pp. 75, 79-83, 99-108; Chui Deposition Exhibits 4, 10-12.)

Chui's limited duty assignments and rehabilitation job offer assignments were not regularly funded positions or bid assignments, which are jobs that are awarded to employees based on seniority. (EX. 1, Chui Depo., at pp. 98-99, 128; EX. 2, Woods Decl., at ¶¶ 10, 11.) Rather, the limited duty assignments and rehabilitation job offer assignments were created specifically for her. (EX. 1, Chui Depo., at p. 99; EX. 2, Woods Decl., at ¶ 11.) Indeed, Chui's rehabilitation job offer assignment was a "helper" to the supervisors and managers, whereby she basically performed many of the duties that they were required to perform. (EX. 1, Chui Depo., at pp. 157-160; EX. 2, Woods Decl., at ¶ 8; EX. 3, Woods Depo. 1, at pp. 52-53, 61, 104, 143-144; EX. 6, Morris Depo., at pp. 92-93; EX. 7, Verastequi Depo., at pp. 20-21.)[3] Since Chui's injury in December 2001, she was not able to perform the essential duties of a mail processing clerk, or any other vacant funded position within the Postal Service. (EX. 1, Chui Depo., at pp. 48-51, 62-68, 71-74; EX. 2, Woods Decl., at ¶¶ 13-18.)

## II.    Chui Placed On Standby Time—June 2009.

For the past several years, the Postal Service has suffered great financial losses due to an unprecedented decline in mail volume, which forced the Postal Service to match work hours to reduced mail volume. (EX. 2, Woods Decl., at ¶ 20.) Due to the financial crisis, the Postal

---

[3] Hereinafter, the Deposition of Linda Woods dated March 1, 2012 will be referred to as "EX. 3, Woods Depo. 1" and the exhibits attached to that transcript will be referred to as "Woods Deposition 1 Exhibit __." In addition, the Deposition of Kasee Morris will be referred to as "EX. 6, Morris Depo." and the Deposition of Dan Versatequi will be referred to as "EX. 7, Verastequi Depo."

Service could no longer "create" work for employees who were injured on the job; instead they were required to perform duties that were "necessary and productive." (EX. 2, Woods Decl., at ¶ 22.) Necessary and productive work is defined as work that is not already held by a bid assigned employee and is available on a daily consistent basis. (EX. 3, Woods Depo. 1, at pp. 34-36; EX. 10, Tuck Depo., at pp. 19-21.)[4] As a result, newly appointed Acting Plant Manager, Linda Woods ("Woods"), instructed all the Kalamazoo P&DC supervisors and managers to place employees who were not performing necessary and productive work on "standby time." (EX. 1, Chui Depo., at p. 148; EX. 2, Woods Decl., at ¶¶ 1, 21; EX. 3, Woods Depo. 1, at pp. 16-18, 28-30, 57-59; EX. 4, Woods Depo. 2, at pp. 179, 182.)[5] While on standby time, employees could sit in a conference room, sit in the break room, or walk around the facility. (EX. 2, Woods Decl., at ¶ 23; EX. 3, Woods Depo. 1, at p. 57; EX. 4, Woods Depo. 2, at p. 187; Woods Deposition 2 Exhibit 12.)

It was determined that Chui's rehabilitation job offer assignment as the supervisors' and managers' "helper" was not considered to be necessary and productive. Essentially, that was because her assignment mainly consisted of duties that the supervisors and managers were required to perform. (EX. 1, Chui Depo., at pp. 157-160; EX. 2, Woods Decl., at ¶¶ 8, 23; EX. 3, Woods Depo. 1, at pp. 52-53, 57, 61, 104, 143-144; EX. 4, Woods Depo. 2, at p. 187; Woods Deposition 2 Exhibit 12; EX. 6, Morris Depo., at pp. 92-93; EX. 7, Verastequi Depo., at pp. 20-21.) As a result, Woods instructed Kalamazoo Manager of Distribution Operations John Priest ("Priest") to place Chui on standby. (EX. 1, Chui Depo., at p. 171.) Effective June 17, 2009, Chui reported to standby where she was able to watch television and read her personal

---

[4] Hereinafter, the Deposition of Jana Tuck will be referred to as "EX. 10, Tuck Depo."
[5] Hereinafter, the Deposition of Linda Woods dated July 2, 2012 will be referred to as "EX. 4, Woods Depo. 2" and the exhibits attached to that transcript will be referred to as "Woods Deposition 2 Exhibit __."

reading material - while at the same time receiving her regular salary and benefits.   (EX. 1, Chui Depo., at p. 171, 176-177.)   After Chui was placed on standby, the Kalamazoo P&DC supervisors and managers reassumed the duties Chui previously performed in her rehabilitation job offer assignment.   (EX. 1, Chui Depo., at p. 140; EX. 5, Priest Depo., at p. 58.)[6]

On October 22, 2009, while Chui was on standby, Priest offered her a limited duty assignment, which Chui refused claiming the duties were outside of her medical restrictions. Chui asserted that her restrictions limited her to a light duty assignment for only two hours.   (EX. 1, Chui Depo., at pp. 183-189; Chui Deposition Exhibit 19; EX. 3, Woods Depo. 1, at pp. 63-64, 75, 81-82; EX. 5, Priest Depo., at pp. 27, 34; Priest Deposition Exhibit 3 pp. 3-4.)   On November 3, 2009, Priest offered Chui a second limited (light) duty job offer, which consisted of the same duties as the October 22, 2009 offer, but fell within Chui's two-hour time limit.   (EX. 1, Chui Depo., at pp. 190-191; Chui Deposition Exhibit 22.)   Chui accepted the November 3, 2009 limited duty job offer.   (*Id*.)   However, despite Chui's acceptance of the November 3, 2009 limited duty job offer, she could not perform the duties that related to the machines or automation.   (EX. 5, Priest Depo., at pp. 28-31, 33-35; Priest Deposition Exhibit 3 pp. 1-2.)   Instead, she could only perform one duty which merely consisted of quality checks.   (*Id*.)   As a result, from November 3, 2009 to July 14, 2010, Chui performed quality checks and a few other duties within her medical restrictions for four hours a day.   After that she returned to standby time for the remaining four hours of her work shift.   (EX. 1, Chui Depo., at pp. 204-206, 208-211; Chui Deposition Exhibit 22.)   Once again, the duties Chui performed in her limited duty assignments, beginning November 3, 2009, were not bid assignments.   (EX. 1, Chui Depo., at pp. 191-204-206.)

---

[6] Hereinafter, the Deposition of John Priest will be referred to as "EX. 5, Priest Depo" and the exhibits attached to that transcript will be referred to as "Priest Deposition Exhibit __."

**III.**     **Chui Instructed Not To Wear White/Cream Colored Pants—October 2009.**

On October 28, 2009, Chui reported to work wearing tight fitting cream or off-white colored pants, which are commonly called stretch pants, leggings or tights.   (EX. 1, Chui Depo., at pp. 194-195; EX. 3, Woods Depo. 1, at pp. 87-88, 117-118; Woods Deposition 1 Exhibit 2.) She was also wearing a black top that covered half of her buttocks.   (*Id.*)   Chui's pants were inappropriate because they "defined every body part she had" and her shirt did not cover her buttocks and private parts.   (EX. 3, Woods Depo. 1, at pp. 87-88; EX. 8, Christensen Depo., at pp. 10-13.)[7]   Chui's pants were tight fitting in the crotch area and since her pants were light colored, you "could see the front" so that her genitalia area was exposed.   (*Id.*)   The mound of her genitalia was visible, which is colloquially called "camel toe."   (*Id.*)   Woods spoke to the Kalamazoo Managers of Distribution Operations Dan Verastequi ("Verastequi") and Priest about Chui's pants.   (EX. 3, Woods Depo. 1, at pp. 86-87, 90; EX. 5, Priest Depo., at p. 41.)   Priest did not feel comfortable talking to Chui about her pants, so he asked a female employee, Deb Christensen ("Christensen"), to bring the matter to Chui's attention.   (EX. 5, Priest Depo., at pp. 42-43; EX. 8, Christensen Depo., at pp. 10-11, 26.)   Christensen talked to Chui about her pants for approximately 45 minutes in an attempt to explain to Chui that since her pants were light colored, the outlines of her body stood out more.   (*Id.*)    Despite the discussions regarding her pants, Chui was not disciplined for wearing them and she received the same pay and benefits while wearing the pants.   (EX. 1, Chui Depo., at pp. 200-201.)   In fact, Chui admitted that she wore the pants again with a different shirt, and was not sent home for wearing the pants.   (EX. 1, Chui Depo., at p. 200.)

---

[7] Hereinafter, the Deposition of Debra Christensen will be referred to as "EX. 8, Christensen Depo."

## IV. National Reassessment Process—Sent Home In July 2010.

Due to downsizing and the lack of productive work, prior to 2008, the Postal Service began the National Reassessment Process ("NRP"). The NRP is a formalized process for reassessing injured employees in the Postal Service, examining their work restrictions and their work capabilities. (EX. 10, Tuck Depo., at pp. 14-16, 19.) Prior to the NRP, the Postal Service was required to keep limited duty employees on the clock by "creating" or "making up" work assignments for them. (EX. 10, Tuck Depo., at pp. 17-19, 23-25, 28, 34-35; EX. 11, Eliopoulos Depo., at pp. 16-17.)[8] Since the implementation of the NRP, employees are not kept on the clock (i.e., do not continue to work in a created work assignment). (*Id*.) Instead, a search for necessary and productive work is conducted for employees to perform within their medical restrictions—first, within the facility and second, within 50 miles of the facility. (*Id*.) If the search for necessary and productive work resulted in no work available for the employee, then the employee is notified how to apply for Office of Worker's Compensation Program ("OWCP") benefits and then sent home. (*Id*.)

On July 14, 2010, Jana Tuck (NRP Team Leader), Mary Mangutz (NRP Team Member) and Priest met with Chui to give her a "complete day no work letter" informing her that a search for work was conducted within her facility and outside of her facility, but no necessary and productive work was found within her restrictions. (EX. 1, Chui Depo., at pp. 210-212; Chui Deposition Exhibit 23; EX. 5, Priest Depo., at p. 55; Priest Deposition Exhibit 8; EX. 10, Tuck Depo., at pp. 5-6, 8-9, 13-14, 16, 19) The letter, signed by Priest, informed Chui that she was being sent home. (*Id*.) Nevertheless, from July 14, 2010 to the present, Chui continued to

---

[8] Hereinafter, the Deposition of Beth Eliopoulos will be referred to as "EX. 11, Eliopoulos Depo."

receive tax free compensation from the OWCP, at the rate of 67% of her regular postal wages. (EX. 1, Chui Depo., at pp. 212-213.)

## V.    Chui's Equal Employment Opportunity History.

Chui has filed three (3) Equal Employment Opportunity ("EEO") cases.   (EX. 1, Chui Depo., at p. 215.)   In the first EEO case, Chui contacted EEO on February 4, 2002 and that case closed on June 30, 2003 in the form of a settlement agreement.   (EX. 1, Chui Depo., at pp. 215-216; EX. 12, Davis Decl., at ¶ 3.)[9]   In Chui's second EEO case, she contacted EEO on July 2, 2003 and that case closed on December 29, 2004 in the form of a settlement agreement.   (EX. 1, Chui Depo., at pp. 217-218; EX. 12, Davis Decl., at ¶ 4.)

In Chui's third EEO case (EEO Case No. 1J-487-0014-09), she contacted EEO on August 11, 2009 asserting race, national origin and disability discrimination when she was placed on standby on June 17, 2009.   (EX. 1, Chui Depo., at pp. 219-220; Chui Deposition Exhibit 25).   She did not assert that she was retaliated against when she was placed on standby.   (*Id*.)

In that same case, on or about September 28, 2009, Chui filed a formal complaint of discrimination where she asserted that she was discriminated against based on her race, national origin and disability when she was placed on standby in June 2009.   (EX. 1, Chui Depo., at pp. 220-223; Chui Deposition Exhibit 26.)   Again, in her formal complaint, Chui did not assert that she was retaliated against when she was placed on standby.   (*Id*.)   The following issues were accepted for investigation in that case:   whether Chui was discriminated against based on her race, national origin and physical disability when, since June 17, 2009, she has not been reasonably accommodated when she was not allowed to perform her rehabilitation job and was placed on standby.   (EX. 1, Chui Depo., at pp. 223-224; Chui Deposition Exhibit 27.)

[9] Hereinafter, the Declaration of Barbara Davis will be referred to as "EX. 12, Davis Decl."

In that third EEO case, Chui contacted EEO again on November 3, 2009 asserting she was retaliated against and discriminated against based on her race, national origin and disability when, on October 28, 2009, she was told not to wear a certain pair of pants. (EX. 1, Chui Depo., at pp. 224-225; Chui Deposition Exhibit 28.) The Postal Service EEO office dismissed the pants issue. (EX. 1, Chui Depo., at pp.225-226; Chui Deposition Exhibit 29.)

At no time did Chui contact EEO or file a formal complaint of discrimination asserting that she was sent home through the NRP for discriminatory reasons. (EX. 1, Chui Depo., at pp. 228-230.) In fact, Chui testified that she wanted to be sent home all along and requested that Priest send her home. (EX. 1, Chui Depo., at p. 253; EX. 5, Priest Depo., at pp.15-16, 44.) Moreover, Chui admitted during her deposition that she does not believe that she was discriminated against when she was sent home through the NRP in July 2010 and the fact that she was sent home is not an issue in the instant lawsuit. (EX. 1, Chui Depo., at pp. 228-230).

## VI. Chui's District Court Complaint.

Chui has filed suit asserting that she was discriminated against in violation of the Rehabilitation Act based on her disability, and in violation of Title VII and 42 U.S.C. § 1981a under section 717 of the Equal Employment Opportunities at of 1972, as amended. (Dkt. No. 1, Compl. at ¶¶ 5, 45, 56.) Specifically, Chui alleges that the Postal Service discriminated against her based on her race, national origin and disability; and failed to accommodate her disability when she was placed on standby beginning on June 17, 2009. (*Id*. at ¶¶ 19, 27.) She further claims that she was retaliated against and discriminated against based on her race, national origin and disability when she was told she could not wear a certain pair of pants to work on October 28,

2009.   (*Id.* at ¶¶ 32, 42.)   Chui also asserted that her restrictions were not accommodated when she was sent home on July 14, 2010.   (*Id.* at ¶ 40.)

## LEGAL STANDARDS

### I.   Fed. R. Civ. P. Rule 12(b)(1) Motion To Dismiss.

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of a complaint for lack of subject matter jurisdiction.   Federal courts are courts of limited jurisdiction and may exercise only those powers authorized by Constitution and statute.   *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994).   Therefore, "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction."   *Kokkonen*, 511 U.S. at 377 (citations omitted).   The first and fundamental question presented by every case brought to the federal courts is whether it has jurisdiction to hear a case.   *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).   When a defendant challenges subject matter jurisdiction, the plaintiff has the burden of proving jurisdiction in order to survive the motion, *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990), and the court may "resolve factual disputes when necessary to resolve challenges to subject matter jurisdiction," *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1130 (6th Cir. 1996).   Further, when there is a factual question as to whether jurisdiction exists, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."   *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).

### II.   Fed. R. Civ. P. Rule 56 Motion For Summary Judgment.

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(c).   The moving party

has the initial burden of identifying the portion of the record that demonstrates that there are no genuine issues of material fact as to an essential element of the plaintiff's claim. *Celotex v. Catrett*, 477 U.S. 317, 322-26 (1986); *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003). Once the moving party has done so, the non-moving party must produce specific facts that demonstrate a genuine issue of material fact for trial in order to withstand summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986); *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004). The court views the evidence in the light most favorable to the non-moving party. *Sutherland*, 344 F.3d at 613. The non-moving party, however, "may not rest upon its mere allegations." *Id.* (*citing Celotex*, 477 U.S. at 324). "The existence of a mere scintilla of evidence in support of the non-moving party's position" is not sufficient to withstand summary judgment. *Sutherland*, 344 F.3d at 613 (*citing Anderson*, 477 U.S. at 251). The non-moving party must present "significant probative evidence" to show that "there is more than some metaphysical doubt as to the material facts." *Id.* There must be evidence upon which the fact finder could reasonably find for the non-moving party. *Id.* Summary Judgment is also proper if a party fails to establish an essential element of her case on which she bears the burden of proof. *Celotex*, 477 U.S. at 323.

## ARGUMENT

I. **Title VII And The Rehabilitation Act Are The Exclusive Judicial Remedies For Claims Of Employment Discrimination Against The Postal Service.**

Chui brings Counts I and III (Dkt. No. 1, Compl. at Count I ¶ 45; Count III ¶ 56) against the Postmaster General of the United States Postal Service in his official capacity under Title VII; 42 U.S.C. § 1981a; Section 717 of the Equal Employment Opportunities Act of 1972, as amended; and the Rehabilitation Act. The basis of these counts is Chui's allegations that she was placed on

standby beginning on June 17, 2009 and told she could not wear a particular pair of pants to work on October 28, 2009, because of her race, national origin, disability and engagement in prior protected activities.

It is very clear that Chui's exclusive remedy for such actions is pursuant to Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-5 and 2000e-16 and the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 *et. seq.*   Indeed, Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment."   *Brown v. General Services Admin.*, 425 U.S. 820, 835 (1976); *see also, Briggs v. Postmaster General*, 463 F.3d 507, 517 (6th Cir. 2006); 42 U.S.C. § 2000e, *et seq.*   Moreover, the Sixth Circuit holds that the Rehabilitation Act creates the exclusive right of action for federal employees who assert a claim of disability discrimination.[10] *Jones v. Postmaster General*, 488 F.3d 397, 403 (6th Cir. 2007).   Accordingly, this Court lacks subject matter jurisdiction over Chui's employment discrimination claims that the Postal Service violated 42 U.S.C. § 1981a.

**II.    Chui Failed To Exhaust Her Administrative Remedies With Regard To Her Retaliation Claims - Regarding Being Placed On Standby Or Her Claim That She Was Discriminatorily Sent Home In July 2010.**

In Chui's Complaint, she asserted that she was retaliated against when she was placed on standby beginning on June 17, 2009, and that she was retaliated against and discriminated against based on her race, national origin and disability when she was sent home on July 14, 2010.   (Dkt. No. 1, Compl. at ¶¶ 19, 40, 42-44, 47, 50-51, 54, 55.)   Chui, however, failed to exhaust her administrative remedies with regard to any of her discrimination claims regarding her being sent

---

[10]The ADA, 42 U.S.C. § 12111 *et seq.*, prohibits private employers from discriminating on the basis of disability. Federal courts may look to precedent under the ADA in deciding cases brought under the Rehabilitation Act. *McPherson v. Michigan High School Athletic Ass'n, Inc.*, 119 F.3d 453, 459-60 (6th Cir. 1997); 29 U.S.C. § 794(d).

home in July 2010 and her retaliation claim regarding being placed on standby beginning in June 2009. Therefore, as discussed in more detail below, this Court should grant summary judgment in favor of the Postal Service.

It is well established that the exhaustion of administrative remedies is a prerequisite to filing a claim of discrimination against a governmental agency. *Brown*, 425 U.S. at 832; *Hunter v. Secretary of U.S. Army*, 565 F.3d 986, 993 (6th Cir. 2009); *Horton v. Postmaster General*, 369 F.3d 906, 910 (6th Cir. 2004). In order for an employee to exhaust her administrative remedies, she must seek relief from the EEO department of the federal agency, as required by the procedures outlined in Section 717(c) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16(c). *Brown*, 425 U.S. at 832; *Hunter*, 565 F.3d at 993; *Horton*, 369 F.3d at 910. Under the applicable EEO regulations, an employee of a federal agency must first bring her claim of discrimination to the attention of an EEO counselor for informal counseling "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a*); see also Hunter*, 565 F.3d at 993; *Horton,* 369 F.3d at 910. As a general rule, where a plaintiff fails to comply with any of the time limits for pursuing her administrative remedies, she will be barred from litigating her claims in court. *Brown*, 425 U.S. at 832-33; *Hunter*, 565 F.3d at 993; *Horton,* 369 F.3d at 910.

The record indicates that, prior to filing this federal district court action, Chui initiated contact with the EEO office on four (4) occasions, which resulted in three (3) separate EEO cases. (EX. 1, Chui Depo., at pp. 215-220, 224-225; Chui Deposition Exhibits 25, 28; EX. 12, Davis Decl., at ¶¶ 3, 4.) Chui's last EEO case, which is the underlying administrative action to this lawsuit, consisted of her contacting EEO on two occasions regarding her placement on standby on June 17, 2009 and her being told not to wear a particular pair of pants on October 28, 2009. (EX.

1, Chui Depo., at pp. 219-220, 224-225; Chui Deposition Exhibits 25, 28.)   Chui failed to raise a retaliation claim during her EEO contact when she was placed on standby in June 2009, nor did she assert a retaliation claim in her formal EEO complaint.   Consequently, "retaliation" is not an accepted purview with regard to her being placed on standby.   (EX. 1, Chui Depo., at pp. 219-224; Chui Deposition Exhibits 25-27.)

Not only did Chui fail to raise a claim that she was retaliated against during the administrative processing of her EEO case for her standby claim, but she also failed to contact EEO regarding her being sent home on July 14, 2010.   (EX. 1, Chui Depo., at pp. 228-230.)   During her deposition, moreover, Chui testified that she did not initiate contact with EEO regarding being sent home because she did not believe that it was discriminatory and she was not raising it as an issue in this case.   (*Id*.)   In fact, she testified that she wanted to be sent home instead of being placed on standby.   (EX. 1, Chui Depo., at p. 253; EX. 5, Priest Depo., at pp. 15-16, 44.)

As a result, the Equal Employment Opportunity Commission ("EEOC") never had the opportunity to consider the merits of Chui's retaliation claim, regarding being placed on standby, or her claim that she was discriminatorily sent home in July 2010.   Based on Chui's own admissions, she has failed to exhaust her administrative remedies with regard to those claims.   Accordingly, she is precluded from raising them in this action and summary judgment should be entered in the Postal Service's favor with regard to those claims.

III.    **Burden Shifting Analysis.**

The burden shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-805 (1973), applies to claims based on indirect evidence of discrimination, as in this case. *Jones*, 488 F.3d at 403-404; *Gribcheck v. Postmaster General*, 245 F.3d 547, 550 (6ᵗʰ Cir. 2001). For the plaintiff to prevail, she must first establish a *prima facie* case of discrimination. *McDonnell Douglas,* 411 U.S. at 802.

Once this *prima facie* showing is made, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its actions. *Texas Dep't of Cmty Affairs v. Burdine,* 450 U.S. 248, 253 (1981) (*quoting McDonnell Douglas*, 411 U.S. at 802.); *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6ᵗʰ Cir. 2006). If this burden is met by the employer, the legal presumption of employment discrimination "drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *Burdine*, 450 U.S. at 254, 255 n.7. Once an employer offers legitimate, nondiscriminatory reasons for any adverse actions against an employee, the burden shifts back to the employee to show the legitimate reason or reasons asserted by the defendant were not true reasons, but were a "pretext for discrimination." *Burdine*, 450 U.S. at 256; *Wright*, 455 F.3d at 706-707. The ultimate inquiry is whether the employer intentionally discriminated against the complainant. *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

In the present case, Chui cannot establish the *prima facie cases* of her discrimination claims based on her race, national origin and disability; nor her retaliation claim. Assuming arguendo that Chui established her *prima facie cases* of discrimination and retaliation, summary judgment should be granted in the Postal Service's favor because the Postal Service proffered legitimate, nondiscriminatory reasons for placing Chui on standby and instructing her not to wear a

particular pair of pants.   Plaintiff Chui simply cannot show that those reasons were a mere pretext for discrimination or retaliation.

## IV.    Chui Cannot Establish Disability Discrimination Under The Rehabilitation Act.

Chui claims that she was discriminated against based on her disability when she was placed on standby beginning in June 2009 and then instructed not to wear a particular pair of pants in October 2009.   (Dkt. No. 1, Compl. at ¶¶ 19, 32; Count II.)   She further claims that she was not reasonably accommodated when she was placed on standby.   (*Id.* at ¶ 27; Count II.)   Chui, however, is unable to establish a *prima facie case* of disability based discrimination because she is not considered to be an otherwise qualified individual with a disability pursuant to the Rehabilitation Act.   In order for Chui to prevail in a disability discrimination claim, she must prove that:   (1) she is disabled; (2) she was otherwise qualified to perform the requirements of her job, with or without a reasonable accommodation; (3) she suffered an adverse employment action; (4) her employer knew or had reason to know of her disability; and (5) following the adverse employment action, she was replaced by a person that was not disabled or her position remained open.   *Daugherty v. Sajar Plastics, Inc.* 544 F.3d 696, 703 (6th Cir. 2008); *DiCarlo v. Potter*, 358 F.3d 408, 418 (6th Cir. 2004).   Similarly, to establish a *prima facie* failure to accommodate claim, Chui must show the first two elements above, as well as that:   (3) the Postal Service was aware of Chui's disability; (4) an accommodation was necessary; and (5) the Postal Service failed to provide a reasonable and necessary accommodation.   *Gaines v. Postmaster General,* 107 F.3d 1171, 1175 (6th Cir. 1997).   Moreover, Chui must identify a vacant, funded position for which she was qualified to perform the essential functions, with or without an accommodation; a failure to do so precludes her from establishing a *prima facie case*.   *Willard v. Postmaster General,* 264 Fed. Appx. 485, 487-88 (6th Cir. 2008) (*citing, Peltier v. United States*, 388 F.3d 984, 989 (6th Cir.

2004)).   As discussed herein, Chui's claims against the Postal Service fail for the threshold reason that she is not a "qualified individual" with a disability under the Rehabilitation Act.[11]

**A.      Chui Is Not A "Qualified Individual" With A Disability.**

Chui is not an otherwise qualified individual able to perform the essential functions of her position with or without a reasonable accommodation.   To establish that she is a "qualified individual" with a disability, Chui must show not only that she has a disability within the meaning of the Rehabilitation Act, but also that she is qualified for the job, *i.e.*, that she is able to perform the essential functions of the job, with or without reasonable accommodation.   42 U.S.C. § 12111(8); *Willard,* 264 Fed. Appx. at 487-88 (*citing, Peltier*, 388 F.3d at 989).   The factors the Court may consider to determine whether a particular duty is an essential function include the employee's job description, the employer's judgment, the amount of time spent performing the function, the consequences for not requiring the individual to perform the duty, the terms of the collective bargaining agreement, and past and current work experiences.   *Hoskins v. Oakland County Sheriff's Dept.*, 227 F.3d 719, 726 (6th Cir. 2000); *Brickers v. Cleveland Bd. Of Educ.*, 145 F.3d 846, 849 (6th Cir. 1998); 29 C.F.R. § 1630.2(n)(3)); *see also* 42 U.S.C. § 12111(8) ("[I]f an employer has prepared a written description . . . , [it] shall be considered evidence of the essential functions of the job.").

Chui was employed with the Postal Service as a mail processing clerk.   (EX. 1, Chui Depo., at pp. 38-42; Chui Deposition Exhibit 2; EX. 2, Woods Decl., at ¶ 5.)   The purpose of her position was to process mail "using automated mail processing equipment or manual methods of sortation and distribution."   (EX. 1, Chui Depo., at pp. 42-46; Chui Deposition Exhibit 3.)   Chui

---

[11]  For purposes of this motion only, the Postal Service concedes that Chui is disabled as defined by the Rehabilitation Act because she suffers a physical impairment that substantially limits a major life function.   Chui's disability discrimination claim, however, fails for independent reasons as discussed herein.

admitted that the main duties of her position as a mail processing clerk were to work on the flat sorter or LIPS machines; and case flats (i.e., manually sort large envelopes or magazine sized mail). (EX. 1, Chui Depo., at pp. 10-14, 21-23, 46-47.) The physical requirements of her position required " . . . arduous exertion involving prolonged standing, walking, bending and reaching, and may involve the handling of heavy containers of mail and parcels weighing up to 70 pounds," which specifically included: lifting/carrying up to 70 pounds intermittently eight hours per day; no sitting; standing eight hours per day; walking eight hours per day; intermittent climbing four hours per day; intermittent kneeling four hours per day; intermittent bending or stooping four hours per day; intermittent twisting four hours per day; intermittent pulling or pushing four hours per day; intermittent simple grasping six hours per day; no fine manipulation; intermittent reaching above the shoulder four hours per day. (EX. 1, Chui Depo., at pp. 47-48, 183-185; Chui Deposition Exhibit 3, at p. 2; Chui Deposition Exhibit 19.)

Here, there is no dispute that Chui could not – at any point in time after December 2001 – perform the essential functions of her job as a mail processing clerk, which was her official position or bid assignment. (EX. 1, Chui Depo., at pp. 38-42, 48-51; Chui Deposition Exhibit 2; EX. 2, Woods Decl., at ¶ 5.) She agrees that her duties as a mail processing clerk involved lifting up to 50 pounds, standing, fine manipulation of keying, bending, pushing and pulling. (EX. 1, Chui Depo., at pp. 10-23.) It also involved reaching and twisting while placing mail into cubby holes, i.e., casing. (EX. 2, Woods Decl., at ¶ 14.)

Instead of performing the essential duties of her mail processing clerk position, Chui claims that she can case mail for only two hours. (EX. 1, Chui Depo., at pp. 48-51.) However, there is no vacant funded positions as mail processing clerks to case mail for only two hours, on the contrary that position requires the operation of machinery *and* casing mail. (EX. 1, Chui Depo., at pp. 42-47; Chui Deposition Exhibit 3; EX. 2, Woods Decl., at ¶ 14.) In fact, December 31, 2001, was the last day Chui performed her full duties as a mail processing clerk and she has not been able to perform the duties of that position since that date. (EX. 1, Chui Depo., at pp. 37, 74-75, 78-83, 92-94, 99-108; Chui Deposition Exhibits 4, 6, 7, 10-12.) Since Chui freely admits that since her injury in 2001, she could not and cannot perform the essential functions of her official position as a mail processing clerk, it stands to reason that no reasonable jury could conclude that Chui was qualified to work as a mail processing clerk. Because Chui cannot perform the essential functions of her position with or without an accommodation and, therefore, is not a qualified individual with a disability, this Court must grant summary judgment in the Postal Service's favor as to all of Chui's disability discrimination claims.

**B.** **Chui Cannot Establish A Failure To Accommodate Claim.**

Even if Chui could show she is an otherwise qualified individual as defined by the statute (which she cannot), her claim still fails as a matter of law because she failed to identify a vacant funded position which she is qualified to perform with or without a reasonable accommodation. *See Willard*, 264 Fed. Appx. at 487-88 (a plaintiff claiming that she should have been accommodated by a reassignment must "identify a vacant, funded position for which she was qualified, with or without accommodation, that existed at the time of her request for reassignment."). Chui must identify the necessary accommodation and show that it was objectively reasonable; a failure to do so precludes her from establishing a *prima facie case*.

*Willard,* 264 F. App'x 485, 487-88; *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007)*; Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 458-459 (6th Cir. 2004).   Chui cannot meet her burden of proposing a necessary and objectively reasonable accommodation. *Hedrick*, 355 F.3d at 457.   Accordingly, the Court must grant summary judgment on this basis as well.

Chui may argue that after her injury in December 2001, she was able to perform *some* of the duties of a mail processing clerk, such as casing mail for only two hours, but is unable to work on the machines.   (EX. 1 ,Chui Depo., at pp. 48-51.)   Her official position was that of a mail processing clerk, so that is the position for which she must be qualified.   *Scott v. Detroit Medical Center*, 2008 WL 186362 * 7 (E.D.Mich. 2008) (*citing, Phelps v. Optima Health, Inc*., 251 F.3d 21, 25 (1st Cir. 2001); *see also, Gratzl v. Office of Chief Judges of 12th, 18th, 19th, and 22nd Judicial Circuits*, 601 F.3d 674, 680 (7th Cir. 2010).   Based on Chui's testimony, it appears that she is requesting the restructure of her mail processing clerk position so that it only requires her to perform part of the duties for a maximum of two hours.   Job restructuring, however, only applies to the non-essential or marginal functions of a job.   *Bratten v. SSI Servs., Inc*., 185 F.3d 625, 632 (6th Cir. 1999).   Any accommodation that eliminates an essential function of a job is deemed unreasonable.   *Jasany v. United States Postal Service*, 755 F.2d 1244, 1250 (6th Cir. 1985).   Rather, as Chui testified, mail processing clerks are required to process mail on the machines *and* case mail.   (EX. 1, Chui Depo., at pp. 10-23, 42-47; Chui Deposition Exhibit 3; EX. 2, Woods Decl., at ¶ 14.)   To eliminate the essential function of processing mail on the machines would be unreasonable.   *Jasany*, 755 F.2d at 1250.   Moreover, there are no vacant funded positions for a mail processing clerk that only requires casing mail for a maximum of two hours.   (EX. 2, Woods Decl., at ¶ 14.)

Chui may also argue that her ability to work limited duty or rehabilitation job assignments such as a "helper" or secretary to supervisors and managers demonstrates that she was able to fulfill the essential functions of those assignments, instead of her mail processing clerk position. (EX. 1, Chui Depo., at pp. 110-129, 131-133, 144-147, 157-160; Chui Deposition Exhibits 14, 16; EX. 2, Woods Decl., at ¶¶ 7, 8; EX. 3, Woods Depo. 1, at pp. 52-53, 61, 104, 143-144; EX. 6, Morris Depo., at pp. 92-93; EX. 7, Verastequi Depo., at pp. 20-21.)   That argument also fails because the Postal Service is not required to create a new job, move another employee, promote the disabled employee or violate another employee's rights under a collective bargaining agreement.   *Kleiber*, 485 F.3d at 869**;** *Hedrick*, 355 F.3d at 457 (*citing Burns v. Coca-Cola Enter., Inc.* 222 F.3d 247, 257 (6th Cir. 2000)); *Cassidy v. Detroit Edison Co*., 138 F.3d 629, 634 (6th Cir. 1998).   It is undisputed that the limited duty assignments and rehabilitation job offer assignments Chui performed were created for her based on her medical restrictions.   (EX. 1, Chui Depo., at pp. 75-79-83, 99-108, 191, 204-206; Chui Deposition Exhibits 4, 10-12; EX. 2, Woods Decl., at ¶ 11.) Because Chui's limited duty and rehabilitation job offer assignments were created specifically for her, the Postal Service is not obligated to continue providing those created assignments to her as a form of a reasonable accommodation.   *Hedrick*, 355 F.3d at 457; *Cassidy*, 138 F.3d at 634.

On the contrary, the fact that the Postal Service permitted Chui to work in created positions in the form of her limited duty or rehabilitation job offer assignments, doing some type of work for the Postal Service, "does not mean that [her mail processing clerk] functions were not essential functions of the job within the meaning of the Act."   *Trobia v. Henderson*, 315 F.Supp.2d 322, 331 (W.D.N.Y.2004) (holding postal service employee who due to back disability was physically unable to perform several essential tasks of "box station" job, including handling mail bags weighing over 20 pounds, could not be "otherwise qualified" for purposes of Rehabilitation Act

failure-to-accommodate claim, regardless of fact that employee had been kept in position for period of 18 months; coworkers had performed tasks that employee could not perform during his tenure).   In fact, several courts have held that an employer may not be punished for going beyond the obligations of the Rehabilitation Act.   *Amadio v. Ford Motor Co.*, 238 F.3d 919, 929 (7th Cir. 2001); *Winfrey v. City of Chicago,* 259 F.3d 610, 616 (7th Cir. 2001); *Basith v. Cook County*, 241 F.3d 919, 930 (7th Cir. 2001); *Holbrook v. City of Alpharetta*, 112 F.3d, 1522, 1528 (11th Cir. 1997); *Vande Zande v. Wisconsin Dep't. of Administration*, 44 F.3d 538, 545 (7th Cir. 1995); *Manigan v. SORTA*, 2009 WL 174137 * 8 (S.D. Ohio 2009); *Dabney v. Ohio Dep't. of Administrative Services*, 2006 WL 745176 * (S.D. Ohio 2006); *EEOC v. Hertz Corp.*, 1998 WL 5694 * 3-4 (E.D. Mich. 1998).   Similarly, here, the Postal Service should not be punished for going beyond the requirements of the Rehabilitation Act by providing Chui with created assignments since her injury.

Chui also testified that she believes she could perform some, but not all, of the duties of a mail handler, carrier, custodian and window clerk.   (EX. 1, Chui Depo., at pp. 62-68, 72-74.)   An employee that contends she should have been transferred to another position must identify a vacant, funded position that she was qualified for and that existed at the time of the request for reassignment.   *Peltier v. United States*, 388 F.3d 984, 989 (6th Cir. 2004); *Willard,* 264 F. App'x at 487-88.   Chui, however, cannot and did not identify a vacant, fully funded position within the Postal Service, for which she was qualified, that existed during the relevant times of this action. (EX. 1, Chui Depo., at pp. 71-72; EX. 2, Woods Decl., at ¶ 19.)   Because Chui failed to identify any vacant funded positions that she could otherwise perform, she failed to satisfy her burden for requiring the consideration of reassignment.

Alternatively, regardless of Chui's failure to identify a vacant funded position as a mail handler, carrier, custodian or window clerk, she would not have been qualified to perform the essential functions of any those positions. Simply stated, Chui's medical restrictions of two hours of reaching, two hours of twisting and two hours of lifting 15 pounds frequently and 30 pounds intermittently, prevent her from performing the essential functions of a mail handler, carrier, custodian or window clerk. All of those positions require lifting greater than 30 pounds and more than two hours of reaching, twisting and lifting. (EX. 1, Chui Depo., at pp. 73-74; EX. 2, Woods Decl., at ¶¶ 15-18.)

Therefore, Chui is not otherwise qualified to perform the essential functions of a mail processing clerk, or any other vacant funded position for that matter, with or without a reasonable accommodation. Consequently, summary judgment should be entered in favor of the Postal Service with regard to Chui's disability discrimination claims.

## V. Chui Cannot Establish Her Prima Facie Cases Of Retaliation And Discrimination Based On Disability, Race And National Origin Because She Did Not Suffer An Adverse Action With Regard To Any Of Her Claims.

Chui claims that she was discriminated against based on her disability, race, and national origin; and retaliated against when she was placed on standby beginning in June 2009[12] and further told not to wear a particular pair of pants on October 28, 2009. (Dkt. No. 1, Compl. at ¶¶ 19, 27, 32, 42.) In order to establish a prima facie case of discrimination based on race, national origin and disability; and retaliation, Chui must show that she suffered an adverse action. *Chattman v. Toho Tenaz America, Inc.*, 686 F.3d 339, 347 (6th Cir. 2012); *Romans v. Michigan Dep't. of Human Services*, 668 F.3d 826, 837 (6th Cir. 2012); *Daugherty,* 544 F.3d at

---

[12] As previously argued, Chui failed to exhaust her administrative remedies with regard to her claim that she was retaliated against when she was placed on standby. To the extent that the Court finds that she exhausted her retaliation claim (which she did not), her claim still fails as she did not suffer an adverse action when she was placed on standby.

703; *Gribcheck*, 245 F.3d at 550.   Chui, however, does not allege an adverse action as that term is legally defined.

The Sixth Circuit has held that in order to show that there has been an adverse employment action, a plaintiff must establish that she has suffered a "materially adverse" change in the terms or conditions of employment.   *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000).   Moreover, the anti-retaliation provisions of Title VII protect employees from "material adverse" actions – actions that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination'" because of their EEO activity.   *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 54 (2006).   To sufficiently allege an adverse employment action, a plaintiff must show a "materially adverse change in the terms of ... employment, [such as] termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities. . . ." *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885-86 (6th Cir. 1996).   The action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities.   *Id.*, at 886.   Consequently, not everything that makes an employee unhappy is an actionable adverse action.   Rather, it must be more than de minimis.   *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461-462 (6th Cir. 2000) (holding that the removal of the Coordinator responsibilities did not constitute an adverse action); *Jacklyn v. Schering Plough Healthcare Prod.*, 176 F.3d, 921, 930 (6th Cir. 1999) (holding that "neither requiring plaintiff to work at home while she was recovering from out-patient surgery, nor rejecting computer expenses that previously had been approved, were materially adverse employment actions"); *Jackson v. City of Columbus*, 194 F.3d 737, 752 (6th Cir. 1999) (holding that police chief's suspension with pay was not an adverse employment action); *Hollins v. Atlantic Co.,* 188 F.3d 652, 662 (6th Cir. 1999)

(holding that "[s]atisfactory ratings in an overall evaluation, although lower than a previous evaluation, will not constitute an adverse employment action where the employee receives a merit raise"). In order words, a "bruised ego" caused by trivial employment actions is not sufficient. *Kocsis*, 97 F.3d at 886. As a rule, "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions." *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). Moreover, threats to discharge or discipline are not adverse employment actions. *Hollins*, 188 F.3d at 662.

Here, none of the incidents Chui has complained about rise to the level of an adverse employment action. Her complaints or allegations of adverse actions center on being placed on standby time and being told that she could not wear a pair of white or cream-colored stretch pants to work. While on standby, Chui sat in a room, watched television or read her personal reading material. (EX. 1, Chui Depo., at pp. 176-177.) Moreover, when Chui was instructed not to wear the stretch pants, she was not disciplined and, in fact, wore the same pants again (albeit with a different shirt) without being instructed not to wear the pants again. (EX. 1, Chui Depo., at pp. 200-201.) More significantly, her sitting in a room on standby and being told not to wear a certain pair of pants did not result in a loss of pay or discipline. (EX. 1, Chui Depo., at pp. 176-177, 200-201.) While she may not have liked sitting in a room on standby, or being told that her pants were inappropriate, she did not suffer a tangible adverse employment action. Under Sixth Circuit precedent, she never suffered an adverse action to support a *prima facie* case of discrimination or retaliation.

**VI. Chui Cannot Establish An Inference Of Discrimination Or Retaliation To Otherwise Support a *Prima Facie Case*, Nor Can She Overcome The Postal Service's Legitimate Non-Discriminatory Reasons For Its Actions.**

Even if Chui could establish the elements of her *prima facie cases*, (which she cannot), her claims of discrimination based on disability, race and national origin; and retaliation would fail because the Postal Service had legitimate, nondiscriminatory reasons for placing her on standby and instructing her not to wear a particular pair of pants. An employer's burden in articulating a legitimate reason is light; it merely needs to articulate a reason and need not prove or persuade the court that the decision was actually motivated by that reason. *Carlson v. Leprino Foods Co.,* 522 F. Supp. 2d 883, 890 (W.D. Mich. 2007); *see also Hedrick,* 355 F.3d at 462 (noting that it is inappropriate for the judiciary to substitute its judgment for that of the employer or second-guess its business judgments).

Chui merely makes the conclusory allegation that she was placed on standby based on her race, national origin, disability and engagement in prior protected activities, but fails to substantiate those allegations. In proper context, the Postal Service previously made up or created work for her in the form of limited duty or rehabilitation job offer assignments after her injury in 2001. (EX. 1, Chui Depo., at pp. 75, 79-83, 99-108; Chui Deposition Exhibits 4, 10-12; EX. 2, Woods Decl., at ¶ 11.) Her last rehabilitation job offer, the loss of which is arguably the catalyst for this litigation, was basically a "helper" or secretary to the supervisors and managers—a position that never officially existed. (EX. 1, Chui Depo., at pp. 99, 110-129, 131-133, 145-147, 157-160; Chui Deposition Exhibits 14, 16; EX. 2, Woods Decl., at ¶¶ 7, 8; EX. 3, Woods Depo. 1, at pp. 52-53, 61, 104, 143-144; EX. 6, Morris Depo., at pp. 92-93; EX. 7, Verastequi Depo., at pp. 20-21.) In fact, when Chui assisted the supervisors and managers, she was essentially performing the clerical portion of their supervisory and managerial duties. (EX.

28

1, Chui Depo., at pp. 110-129, 131-133, 144-147, 157-160; Chui Deposition Exhibits 14, 16; EX. 2, Woods Decl., at ¶¶ 7, 8; EX. 3, Woods Depo. 1, at pp. 52-53, 61, 104, 143-144; EX. 6, Morris Depo., at pp. 92-93; EX. 7, Verastequi Depo., at pp. 20-21.)   Then the Postal Service ended the practice of creating work for injured employees due to its widely publicized financial crisis.   As a consequence, the Postal Service instituted a reassessment process that required all employees to engage in necessary and productive work.   (EX. 2, Woods Decl., at ¶ 22.)

Similarly, in more recent years, the Postal Service has suffered great financial losses due to an unprecedented decline in mail volume, which is attributable to ongoing electronic diversion of mail and the current widespread economic recession.   (EX. 2, Woods Decl., at ¶ 20.)   In the face of these economic challenges, the Postal Service (including the Kalamazoo P & DC), has been forced to continue its organization-wide cost reduction initiatives that center on matching work hours to reduced mail volume.   (*Id*.)   As a result, Woods instructed the Kalamazoo supervisors and managers to place all employees, including limited duty or rehabilitation assignment employees, who were not performing necessary and productive work on standby time.   (EX. 2, Woods Decl., at ¶¶ 21-22; EX. 3, Woods Depo. 1, at pp. 57-59.)   As a result, if it was determined that the limited duty or rehabilitation assignment employees were performing work that was part of another person's job assignment or bid, or was performing made up or created work, that employee was to be placed on standby.   (EX. 2, Woods Decl., at ¶ 21; EX. 3, Woods Depo. 1, at pp. 57-59).   Since Chui's rehabilitation job offer assignment was a created assignment that consisted of her performing the supervisor's and manager's duties, she was placed on standby beginning on June 17, 2009.   (EX. 1, Chui Depo., at pp. 75, 79-83, 98-108, 128, 157-160, 171; Chui Deposition Exhibits 4, 10-12; EX. 2, Woods Decl., at ¶¶ 8, 10, 11, 22, 23; EX. 3, Woods Depo. 1, at pp. 52-53, 57, 61, 104, 143-144; EX. 4, Woods Depo. 2, at p. 187;

Woods Deposition 2 Exhibit 12; EX. 6, Morris Depo., at pp. 92-93; EX. 7, Verastequi Depo., at pp. 20-21.)

In this case, Chui can neither show that similarly-situated employees outside of her protected classes were treated better than she was, nor can she submit any other evidence to support an inference of race, national origin or disability discrimination or retaliation. In fact, with respect to her retaliation; and race and national origin discrimination claims, she admitted that Joseph Simmons ("Simmons") was on standby, in the same room as Chui, every day—just like her. (EX. 1, Chui Depo., at pp. 173-174, 176-177; EX. 2, Woods Decl., at ¶¶ 24; EX. 3, Woods Depo. 1, at pp. 48-49, 59; EX. 5, Priest Depo., at p. 17; EX. 9, Brown Depo., at pp. 37-38.)[13] In point of fact, Simmons is not in Chui's protected groups, in that he is non-Asian, non-Chinese and Woods was not aware of him engaging in protected activities. (EX. 2, Woods Decl., at ¶ 24.) Not only was Simmons placed on standby, just like Chui, but also other non-Asian, non-Chinese, non-disabled employees who did not engage in protected activities were placed on standby as well. (EX. 1, Chui Depo., at pp. 171-173, 177; EX. 2, Woods Decl., at ¶¶ 25-28, 31; EX. 3, Woods Depo. 1, at pp. 48-49; EX. 7, Verastequi Depo., at pp. 64-65; EX. 9, Brown Depo., at pp. 6, 24-25.)

With regard to Chui being told not to wear a certain pair of stretch pants, she admits that she was wearing white or cream-colored stretch pants with a shirt that did not hang below her buttocks (i.e., did not entirely cover her buttocks). (EX. 1, Chui Depo., at pp. 194-195.) Chui's stretch pants were inappropriate for the workplace because they "defined every body part she had" and her shirt did not cover her buttocks and private parts. (EX. 3, Woods Depo. 1, at pp. 87-88; EX. 8, Christensen Depo., at pp. 10-13.) More specifically, Chui's stretch pants were

---

[13] Hereinafter, all references to the Deposition of Sarah Brown will be referred to as "EX. 9, Brown Depo."

tight fitting in the crotch area and since her pants were light colored, you "could see the front" so that her genitalia area or genitalia mound was exposed, which is colloquially called "camel toe." (*Id.*) Based on Chui's inappropriate pants, Woods spoke to Verastequi and Priest and told them to talk to Chui regarding the pants she was wearing. (EX. 3, Woods Depo. 1, at pp. 86-87; EX. 5, Priest Depo., at p. 41.) It was a matter of decency or work place courtesy and nothing adverse resulted from the arguably discrete conversations with Chui. Once again, she was not disciplined and not sent home for wearing inappropriate pants. (EX. 1, Chui Depo., at pp. 200-201.)

The record in this case is abundantly clear, Chui cannot come forward with any evidence whatsoever that the real reasons for placing her on standby and for instructing her not to wear inappropriate pants to work were motivated by race, national origin, disability or retaliatory based animus. Along with other employees who were not performing necessary and productive work and who are outside of Chui's protected groups, Plaintiff was placed on standby for legitimate nondiscriminatory reasons rooted in the Postal Service's financial crisis. Chui cannot come forward with any evidence that those reasons are a mere pretext for discrimination or retaliation. Therefore, summary judgment should be entered in the Postal Service's favor.

**CONCLUSION**

For the reasons stated above, Defendant respectfully submits that the Court should dismiss all of Plaintiff's claims against the Defendant Postmaster General with prejudice.

Respectfully submitted,

PATRICK A. MILES, JR.
United States Attorney

Date:   October 2, 2012

/s/ *Michael L. Shiparski*
MICHAEL L. SHIPARSKI (P33064)
Assistant United States Attorneys
P.O. Box 208
Grand Rapids, MI 49501
(616) 456-2404
Email: mike.shiparski@usdoj.gov

Co-Counsel:

Date:   October 2, 2012

/s/ *Lana S. Johnson*
LANA S. JOHNSON
Attorney
U.S. Postal Service Law Dept.
Great Lakes Area Office
433 W. Harrison St., 7th Floor
Chicago, IL 60699-7000
(312) 669-5900
Email: lana.s.johnson@usps.go